

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

COLEMAN JACKSON,　　　　　　　　:

　　　Plaintiff,　　　　　　　　　　:

vs.　　　　　　　　　　　　　　　　:　　CIVIL NO. 2:01-CV-068-WCO

STATE BOARD OF PARDONS &　　:
PAROLES; DEPARTMENT OF　　　:
OFFENDER REHABILITATION　　　:
OF THE STATE OF GEORGIA,　　:

　　　Defendant.　　　　　　　　　:

## O R D E R

The captioned case is before the court for consideration of plaintiff's motion

for equitable judgment [7-1].

## I. Background

Plaintiff is currently confined at the Hall County Correctional Institute

pursuant to an August 4, 1999 conviction for aggravated assault in the Superior

Court of Fulton County, Georgia. See State v. Jackson, No. Z85142 (Ga. Super. Ct.

filed Dec. 20, 1996). Based upon a grand jury indictment charging him with

"unlawfully commit[ting] an assault upon the person of Shirley Ann Welch, by

shooting at, toward, and in her direction with a pistol, and by striking and beating

1

AO 72A ⊕
(Rev. 8/82)

her with a pistol," the court sentenced plaintiff to confinement for a period of twenty years, with five years to serve (Pl.'s Ex. 5 at 33; Def.'s Ex. 4 at 2).[1] Plaintiff did not appeal his conviction or sentence.

As of August 25, 1996, the date of plaintiff's offense, the Georgia General Assembly required prisoners convicted of aggravated assault to serve a minimum of "one-third of the prison term imposed by the sentencing court" before becoming eligible for an initial parole hearing before the State Board of Pardons & Paroles ("the Board"). O.C.G.A. § 42-9-45(f) (2002). Nevertheless, on December 9, 1997, the Board adopted a resolution amending its statutory guidelines "to provide that any offender who is convicted on or after January 1, 1998, of one or more of [twenty enumerated offenses, including aggravated assault] . . . will be required to serve a minimum of 90% of the court imposed term of incarceration in prison" (Pl.'s Ex. 1 at 1; Def.'s Ex. 2 at 2 ("90% time-served policy")). The Board's new 90% time-served policy thus increased the minimum number of months-to-serve for certain offenses, including plaintiff's, postponing the date of the earliest possible parole eligibility hearing until service of 90%, rather than one-third, of the inmate's prison sentence. Further, the Board applied its new policy retroactively; the policy applied

---

[1] Unless otherwise indicated, "Ex." refers to exhibits admitted at the evidentiary hearing held in connection with this matter on April 10, 2002.

2

to all covered convictions entered on or after January 1, 1998 even though, in many cases, the underlying criminal conduct had taken place prior to that date.

On October 2, 2000, the Board informed plaintiff that his recommended tentative parole month ("TPM"), the date upon which he would tentatively be entitled to his first parole eligibility hearing, had been scheduled for June of 2003 (Pl.'s Ex. 5 at 18; Def.'s Ex. 5). Plaintiff challenged his TPM by letter of October 24, 2000, requesting that the Board re-evaluate his parole eligibility (Pl.'s Ex. 5 at 16; Def.'s Ex. 3 at 16). In response, the Board informed plaintiff that, pursuant to its newly adopted 90% time-served policy, plaintiff "must serve 90% or 54 months of his sentence before any parole," and that "the Parole Board [would] not reconsider its decision . . . ." (Pl.'s Ex. 5 at 13; Def.'s Ex. 3 at 13).

Consequently, plaintiff renewed his request for reconsideration by the Board, while also challenging his TPM before Georgia's Superior Courts Sentence Review Panel (Pl.'s Ex. 5 at 10, 12; Def.'s Ex. 3 at 10, 12). In both instances, plaintiff argued that the Board's decision to apply its 90% time-served policy to his offense retroactively increased the punishment inflicted upon him by the State of Georgia, in violation of the Ex Post Facto Clause of the United States Constitution. See U.S. Const. Art. I, § 10, cl. 1. Plaintiff's requests were subsequently denied on February 23, 2001 and March 27, 2001, respectively (Pl.'s Mot. for Equitable J.,

3

Ex. 4; Pl.'s Ex. 5 at 8; Def.'s Ex. 3 at 8). In its March 27, 2001 letter to plaintiff, the Board observed that "[m]any inmates whose offenses were committed prior to January 1, 1998, but were convicted after January 1, 1998, as was [plaintiff], have been considered under the Board's 90% policy . . . The Board is unwilling to deviate from the manner in which this policy has been adopted and implemented" (Pl.'s Ex. 5 at 8; Def.'s Ex. 3 at 8).

Thereafter, on April 25, 2001, plaintiff filed a joint motion for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 and a complaint for damages pursuant to 28 U.S.C. § 1983 [1-1], re-asserting his Ex Post Facto Clause challenge in this court. United States Magistrate Judge John R. Strother, Jr. subsequently issued a report and recommendation ("R&R") [6-1] recommending that plaintiff's § 2241 petition be dismissed without prejudice for failure to exhaust his available state remedies, see 28 U.S.C. § 2254(b)(1) (2001); that Georgia's Eleventh Amendment immunity warranted the dismissal of plaintiff's § 1983 claims for money damages, see U.S. Const. amend. XI; Will v. Michigan Dep't of State Police, 491 U.S. 58, 65 (1989); and that plaintiff's § 1983 ex post facto claim otherwise be permitted to proceed.

Over plaintiff's objections [7-1], the court adopted Judge Strother's R&R as the order of this court on March 7, 2002 [8-1]. Yet, the court was unable to resolve

4

plaintiff's motion for equitable judgment respecting plaintiff's surviving § 1983 claim [7-1], a motion that plaintiff had haphazardly incorporated into his objections to the magistrate's R&R. Specifically, the court noted that plaintiff's motion for equitable judgment, in which he sought to enjoin the Board's enforcement of the 90% time-served policy against him, was not in proper form. Plaintiff had failed to attach any affidavits in support of his factual contentions, in violation of Local Rule 7.1, see L.R. 7.1, NDGa., and plaintiff's factual allegations were insufficiently developed to properly adjudicate the motion. Nevertheless, the court determined that on its face, "[the Board]'s retroactive application of its 90% time-served policy to [plaintiff] [was] constitutionally suspect" (Order at 10). Accordingly, the court set the matter for an evidentiary hearing on April 10, 2002 [9-1], at which time the Board was ordered to show cause, if any, why plaintiff's motion for equitable judgment should not be granted.

## II. The April 10, 2002 Hearing

At the April 10, 2002 hearing, the Board offered testimony from Ms. Tracy D. Masters ("Masters"), Director of the Board's Legal Services Division; Mr. Michael P. Sullivan ("Sullivan"), Director of the Board's Clemency Administration & Parole Selection Division; and Mr. Steve Baustin ("Baustin"), an Officer in the Board's Hearing Examiner Unit for Parole Decision Guidelines.

5

Baustin is one of ten hearing examiners responsible for the calculation of parole eligibility data and a TPM date for each inmate, which is then submitted to the Board for review. The Board thereafter votes to accept or reject the hearing examiner's recommendation. Although Baustin did not personally conduct the initial "months-to-serve" calculation respecting plaintiff's parole eligibility, he briefly outlined the standard procedure each examiner employs:

## A. The Initial TPM Recommendation

First, the examiner identifies the inmate's "Crime Severity Level" on a table of offenses listed from least severe ("Level I") to most severe ("Level VII") (Pl.'s Ex. 4 at 2 ("Crime Severity Levels")). The table classifies aggravated assault as a "Level V" offense. Next, the hearing examiner calculates the inmate's "Total Parole Success Likelihood Score" on a "Parole Decision Guidelines" chart (Pl.'s Ex. 5 at 18; Def.'s Ex. 5; Def.'s Ex. 6). This score represents the sum of eight numerical "Parole Success Factors," historically-based data such as the inmate's number of prior convictions, previous parole or probation violations, and history of drug use. Based upon plaintiff's criminal and social history, plaintiff received a Total Parole Success Likelihood Score of 14.

Once the hearing examiner calculates the Crime Severity Level and Total Parole Success Likelihood Score, the examiner uses the two figures to identify the

6

recommended number of "months-to-serve" on a Parole Decision Guidelines Grid (Pl.'s Ex. 4 ("Guidelines Grid")). For a "Level V" offense with a Parole Success Likelihood Score of 14, the Guidelines Grid recommends that the inmate serve 34 months before being eligible for parole. Notably, the Guidelines Grid describes Parole Success Likelihood Scores in the 14-20 point range as "EXCELLENT."

The hearing examiner then calculates the inmate's TPM based upon the recommended months-to-serve from the Guidelines Grid. In plaintiff's case, for example, the 34 months-to-serve calculation would have generated a recommended TPM of October 2001. Yet, hearing officers cannot submit a TPM to the Board without also considering the minimum parole eligibility requirements: (1) the one-third time-served requirement under O.C.G.A. § 42-9-45(f); and (2) the 90% time-served policy. Further, according to Sullivan, the Director of the Board's Clemency Administration & Parole Selection Division, hearing examiners are instructed to recommend the lengthiest number of months-to-serve to the Board. Thus, as Baustin testified, the TPM date that the hearing examiner recommends to the Board will represent the greater of either (1) the inmate's Guidelines Grid score; or (2) 90% of the inmate's court-imposed prison sentence, if applicable to his offense.

Given his lack of involvement in plaintiff's initial TPM calculation, Baustin could only speculate as to why the Board assigned plaintiff a TPM of June 2003

7

instead of October 2001, the Guidelines Grid recommendation. He admitted, however, that the hearing examiner's application of the 90% time-served policy was the most likely explanation for the approximately 20-month disparity.

## B. The Board's Discretion

Sullivan observed that, aside from the statutory minimum threshold set forth under O.C.G.A. § 42-9-45(f), the Board is not bound by the 90% time-served policy, the hearing examiner's TPM recommendation, or any other calculations made by the hearing examiner. In fact, Sullivan asserted, in making his recommendation, the hearing examiner is "just doing math for the Board." He further testified that nothing prevents the Board from exercising its discretion, and that, in hundreds of cases, the Board has actually departed upward from the recommended TPM date resulting from the application of the 90% time-served policy. Additionally, Sullivan noted that even after the Board votes to approve a particular TPM date, the Board retains discretion to modify that date at any time, which it often does.

Masters, the Board's Director of Legal Services, likewise testified that the 90% policy is merely a "policy" that lacks the effect of law. Rather, she contended, the 90% time-served policy may be modified by the Board at any time, via a majority vote of its members. Masters argued that in enacting the policy, the Board simply wished to promulgate the manner in which it planned to exercise its

8

AO 72A
(Rev. 8/82)

discretion. The Board hoped to inform attorneys, judges, and criminal defendants of its intentions, and to dispel public misconceptions about Georgia's pardon and parole system.

Similarly, Baustin observed that the 90% time-served policy is "just another factor" the Board considers in making parole decisions. He noted that, irrespective of the hearing examiner's recommendation, the Board makes an individualized determination in each case.

On the other hand, on cross-examination, plaintiff elicited testimony from Sullivan indicating that, out of over 8,000 cases, the Board deviated <u>downward</u> from the 90% time-served policy only 10 or 11 times. Further, the Board apparently deviated downward in those 10 or 11 cases because of extraordinary circumstances (i.e., where the inmates at issue had rendered substantial assistance to prosecutors). Although Masters had similarly contended that the Board's broad discretion vitiated the importance of the 90% time-served policy, she admitted on cross examination that the Board follows the hearing examiner's TPM recommendation "all the time," perhaps in as many as 80% of the cases the Board reviews.

## C.  Reconsideration of the Board's TPM Notice

After the Board votes to accept or deny the TPM recommendation submitted by the hearing examiner, the Board notifies the inmate of its decision via a "Parole

9

Decision Guidelines - Notice of Tentative Action" (Parole Decision Guidelines). Said notice includes, <u>inter alia</u>, the Board's TPM recommendation, the months-to-serve calculation generated from the Guidelines Grid, and the cumulative Parole Success Likelihood Score. Further, the notice indicates that "[a]ll decisions made by the Board are tentative and may be changed at the discretion of the Board at any time." At this point, the inmate may request that the Board reconsider his recommended TPM date.

Baustin, who personally reviewed plaintiff's request for reconsideration, testified that in his 23 years of employment with the Board, he has reviewed approximately 1,200 TPM "appeals" per year. Further, Baustin indicated that he has deviated from the Board's TPM decision, and recommended a different TPM, in approximately 20% of those cases. Baustin was unable to determine whether the TPM deviations within that 20% reflected months-to-serve increases, or months-to-serve decreases, but he reiterated that the Board ultimately has discretion to adjust the recommended TPM date in either direction.

When asked by the court whether, on reconsideration, the hearing examiner was authorized to deviate from the Guidelines Grid calculations, Baustin explained that the hearing examiner may include "comments" with his recommendation (Def.'s Ex. 6). Baustin noted that the hearing examiner's TPM recommendation is not

10

always "strictly by the grid," but that all of the pertinent Guidelines Grid figures are provided to the Board for review. Further, Baustin testified that the hearing examiner may include a "policy" recommendation in his submission to the Board.

On the other hand, Baustin's testimony also disclosed that the TPM "appeal" process is somewhat of a misnomer. In practice, the hearing examiner who reviews the inmate's request for reconsideration will not re-calculate the inmate's TPM, re-submit the inmate's parole eligibility data to the Board, or otherwise adjust the inmate's TPM date in any way absent a mathematical error warranting reconsideration. The "reconsideration" process may thus be more accurately described as a request for a TPM "recomputation." Moreover, Baustin asserted that the initial hearing examiner's application of the 90% time-served policy to calculate an inmate's TPM date, and the Board's subsequent acceptance of the examiner's recommendation, is not the sort of "error" warranting recomputation. Rather, according to Baustin, requests for reconsideration filed on this basis are summarily denied by the hearing examiners, ending the review process.

The typical errors Baustin encounters pertain to miscalculated Crime Severity Levels and Parole Success Likelihood Scores, and erroneous applications of the Board's 90% time-served policy (i.e., where the inmate's underlying offense does not fall within the group of offenses covered under the policy). Baustin discovers

11

such errors in approximately 10% of the 30 requests for reconsideration he reviews each week. Even where computation errors are discovered, however, the hearing examiner will not re-submit a case to the Board for reconsideration if the case falls under the 90% time-served policy.[2]

Finally, with respect to plaintiff's requests for reconsideration, Baustin observed that he personally denied plaintiff's requests on January 18, 2001 and February 17, 2001. Baustin asserted that, the Board having accepted the initial hearing examiner's 90% time-served recommendation, he saw no reason to depart from the TPM date at issue. Rather, Baustin testified, the Board would not likely have reconsidered its decision anyway. Baustin noted that although the Board has not made any official declaration to him indicating that the application of the 90% time-served policy is mandatory, the Board has "made it clear that . . . [it] would not reconsider the 90% policy" in the TPM "appeal" context.

### D. Plaintiff's Parole Success Likelihood

As to the likelihood that plaintiff would have received an earlier TPM but for the Board's application of the 90% time-served policy to his offense, Masters indicated that, in her opinion, such a result was unlikely. Rather, she testified that

---

[2] Presumably, Baustin meant that such reconsideration would not take place, as a general rule, because the TPM date generated by the 90% time-served policy typically exceeds the Guidelines Grid recommendation.

12

plaintiff's sentence was unusually short in proportion to the severity of his offense, that the recommendations generated from the Guidelines Grid do not bind the Board, and that irrespective of the adoption of the challenged policy, the Board could have required plaintiff to "max out," or serve his entire 5-year term of incarceration. In Masters' opinion, plaintiff's court-imposed prison sentence was unusually short in relation to similar offenses because the sentencing judge was probably aware of the Board's 90% time-served policy and considered the policy in rendering his sentence.

Utilizing incarceration data for aggravated assault offenders in the Georgia prison system, Sullivan also testified that, in his opinion, plaintiff's sentence was lighter than one might expect given the victim's injuries, plaintiff's use of a weapon, his prior criminal record, and his flight from the police (Def.'s Ex. 12). Further, Sullivan's testimony indicated that the average periods of incarceration imposed by the State of Georgia upon relevant aggravated assault offenders decreased slightly from 1996 (6.5 years imposed) through 2000 (5.9 years imposed), while the average time-served for such offenders increased slightly during the same period (from 2.9 years served in 1996 to 3.2 years served in 2000) (Def.'s Ex. 12). Thus, these statistics arguably corroborated Masters' contention that plaintiff received a lighter sentence because of the Superior Court's awareness of the 90% time-served policy.

13

Yet, Sullivan also acknowledged that plaintiff received the maximum statutory sentence of 20 years, with 5 years to serve, and that plaintiff's "good work history" would have been considered at sentencing.

## III. Plaintiff's Motion for Equitable Judgment

### A. 42 U.S.C. § 1983

To articulate a cognizable claim under 42 U.S.C. § 1983, "plaintiff must show that a person, acting under color of any statute, ordinance, regulation, custom, or usage, deprived him of a right, privilege, or immunity secured by the Constitution." Nat'l Abortion Fed'n v. Metro. Atlanta Rapid Transit Auth., 112 F. Supp.2d 1320, 1328 (N.D. Ga. 2000). Plaintiff's § 1983 claim is rooted in the Board's alleged violation of plaintiff's rights under the Ex Post Facto Clause of the United States Constitution [1-1]. See U.S. Const. Art. I, § 10, cl. 1. The alleged violation stems from the Board's retroactive enforcement of its 90% time-served policy against plaintiff, thus the Board may fairly be characterized as "acting under color" of state law within the meaning of § 1983. 42 U.S.C. § 1983.

### B. Analysis of Plaintiff's Ex Post Facto Claim

#### 1. Ex Post Facto Standard

To prove that a retroactively applicable parole board procedure violates the Ex Post Facto Clause, a prisoner must show that the challenged action "creates a

14

significant risk of prolonging [his] incarceration." Garner v. Jones, 529 U.S. 244, 251 (2000). In two recent opinions, one of which originated in this very district, the United States Supreme Court suggested that a retroactive amendment postponing a prisoner's initial parole eligibility date would offend the constitutional ban on ex post facto legislation. See Garner, 529 U.S. at 250-51 (2000); California Dep't of Corrections v. Morales, 514 U.S. 499, 511 (1995). Additionally, nearly thirty years ago the Supreme Court observed that "a repealer of parole eligibility previously available to imprisoned offenders would clearly present the serious question under the ex post facto clause [citations omitted] of whether it imposed a 'greater or more severe punishment than was prescribed by law at the time of the . . . offense.'" Warden, Lewisburg Penitentiary v. Marrero, 417 U.S. 653, 663 (1974) (emphasis added) (quoting Rooney v. North Dakota, 196 U.S. 319, 325 (1905)). That same Supreme Court cited, with apparent approval, a decision of the United States Court of Appeals for the Ninth Circuit holding that "[u]nder California law, a convicted person's eligibility for parole consideration (as opposed to parole) is part of the 'law annexed to the crime when committed' . . . and any legislative change in such eligibility which would work to a prisoner's disadvantage may not be retroactively applied." Love v. Fitzharris, 460 F.2d 382, 383 (9th Cir. 1972), vacated on other grounds, 409 U.S. 1100 (1973). See also Akins v. Snow, 922 F.2d 1558, 1563

15

AO 72A
(Rev. 8/82)

(11th Cir. 1991), cert. denied, 501 U.S. 1260 (1991) (opining that the Ex Post Facto Clause "applies to a change in parole eligibility" because "parole eligibility must be considered part of any sentence . . . .").

Nevertheless, the Supreme Court has declared that there is no "simple formula" for determining whether official rules or procedures violate the Ex Post Facto Clause. Garner, 529 U.S. at 252. Rather, in the pardons and paroles context, the inquiry ultimately boils down to whether, in light of all of the relevant facts and circumstances, the prisoner can show "through evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than [he would have received] under the earlier rule." Id. at 255. To make such a showing, the inmate need not prove "that he definitely would have served a lesser sentence under the previous legal regime," Jones v. Georgia State Board of Pardons & Paroles, 59 F.3d 1145, 1149 (11th Cir. 1995) (emphasis omitted) (citing Miller v. Florida, 482 U.S. 423, 432 (1987)), only that the challenged procedure creates a "sufficient risk" of doing so. Morales, 514 U.S. at 509.

To inform this analysis, courts should examine the parole board's internal policy statements, for "[a]t a minimum, policy statements, along with the Board's actual practices, provide important instruction as to how the Board interprets its

16

enabling statute and regulations, and therefore whether . . . the amendment [at issue] . . . create[s] a significant risk of increased punishment." Garner, 529 U.S. at 256. Further, such "policies and practices will indicate the manner in which [the Board] is exercising its discretion." Id.

Ex Post Facto Clause analysis also requires courts to gauge the level of discretion actually exercised by the parole board in question. For example, both Garner v. Jones, 529 U.S. 244, and Jones v. Georgia State Board of Pardons & Paroles, 59 F.3d 1145, involved ex post facto challenges to certain parole eligibility procedures that were retroactively enforced by Georgia's State Board of Pardons & Paroles, the defendant in the instant litigation. The Garner court examined a Board rule that retroactively decreased the frequency, from three years to eight years, with which prisoners serving life sentences would be granted parole reconsideration hearings after an initial denial. See Garner, 529 U.S. at 247. In Jones, a Georgia inmate sought to enjoin the enforcement of a Board rule that retroactively required "Level V" offenders to serve the greater of either (1) the recommended months-to-serve from the Guidelines Grid; or (2) one-third of the court-imposed sentence of incarceration, before being eligible for parole. 59 F.3d at 1148. Previously, only the more serious "Level VI" and "Level VII" offenders were subject to the one-third time-served requirement; "the TPM of prisoners with [Crime Severity Levels] of I

17

through V was determined, prior to any discretionary departure, solely by reference to the [Guidelines Grid]." Id. at 1147.

Although the United States Court of Appeals for the Eleventh Circuit had found, in Garner, that the challenged rule violated ex post facto, the Supreme Court ultimately reversed and remanded for further findings on grounds that the Eleventh Circuit failed to evaluate whether the rule actually posed a sufficient risk of increasing the inmate's punishment. See Garner 529 U.S. at 255. Specifically, the Supreme Court could not determine, from the record before it, whether the Board's discretion to grant a parole reconsideration hearing during the eight-year interval in which no hearing was due, or the Board's discretion to grant expedited reconsideration hearings in the event of a change in circumstances, vitiated the underlying ex post facto concerns. See id.

Likewise, the "undisputed fact" that the Board "retained and in fact exercised virtually unfettered discretion to deviate both above and below the Guidelines-recommendation in setting the TPM" was the key to the Eleventh Circuit's decision in Jones. 59 F.3d at 1149. Affirming the district court's conclusion that the Board's retroactive extension of the one-third time-served requirement to Level V offenders did not violate the Ex Post Facto Clause, the Eleventh Circuit opined that "the degree of the Board's continuing parole discretion implies that the TPM rule change

18

'create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes . . . .'" Id. (quoting Morales, 514 U.S. at 500).

Finally, several federal decisions suggest that a challenged parole eligibility method, policy, or procedure need not necessarily take the form of a law, rule, or regulation to implicate the Ex Post Facto Clause. See, e.g., Garner, 529 U.S. at 255 (opining that ex post facto plaintiff must show that the rule has the effect of retroactively increasing his punishment); United States v. Adeleke, 968 F.2d 1159, 1160 (11th Cir. 1992) (opining that the retroactive use of an application note to the federal sentencing guidelines, lacking "the force of law," cannot be deemed to have "changed the law" for ex post facto purposes.); Akins, 922 F.2d at 1561 (11th Cir. 1991) (opining that the rules and regulations of the Board, a quasi-legislative entity, implicate ex post facto because they have the force and effect of law); Dufresne v. Baer, 744 F.2d 1543, 1550 (11th Cir. 1984) (opining that the federal parole guidelines lacked "the characteristics of law . . . They are not filed and rigid, but are flexible" and, therefore, did not violate the Ex Post Facto Clause); United States ex rel. Graham v. United States Parole Comm'n, 629 F.2d 1040, 1043 (5th Cir. 1980) (opining that any "official post-sentence action that delays eligibility for supervised release runs afoul of the ex post facto proscription."); Warren v. Baskerville, 233

19

AO 72A
(Rev.8/82)

F.3d 204, 208 (4th Cir. 2000) (opining that a retroactive parole "policy" change "did not for ex post facto purposes have the force and effect of law."); Hill v. Jackson, 64 F.3d 163, 169-70 (4th Cir. 1995) (opining that parole reconsideration "policy" did not violate ex post facto because application of the policy was not "automatic," appeals were permitted, and the policy did not affect standards for initial parole consideration); Hamm v. Latessa, 72 F.3d 947, 957 (1st Cir. 1995) (observing, in dicta, that a retroactively applicable parole policy would constitute a "law" within the meaning of the Ex Post Facto Clause if it "possess[ed] the full force and effect of law . . . ."); Geraghty v. U. S. Parole Commission, 579 F.2d 238, 267 (3d Cir. 1978), vacated on other grounds, 445 U.S. 388 (1980) (noting that parole "guidelines" would violate ex post facto if applied in a fixed and mechanical way); Love, 460 F.2d at 385 (9th Cir. 1972) (opining that a parole board's retroactive interpretation of a parole eligibility provision was subject to ex post facto constraints because the interpretation had the effect of law); Oglesby v. Ray, 8 F. Supp.2d 1379, 1380 (N.D. Ga. 1998) (Thrash, J.), rev'd on other grounds, 180 F.3d 272 (11th Cir. 1999) (applying ex post facto analysis to a retroactive parole board "policy").[3]   Rather, as noted, ex post facto considerations apply in the parole

_____

[3] In Oglesby v. Ray, the district court initially determined that the challenged parole reconsideration "policy" withstood ex post facto scrutiny because it did not create a sufficient risk of retroactively increasing the inmate's punishment. See 8

20

eligibility context to any official policy or procedure that has the full force and effect of law, and whose practical implementation produces a "sufficient risk" of retroactively lengthening the inmate's period of incarceration. Morales, 514 U.S. at 509.

## 2. Plaintiff's Challenge to the Board's 90% Time-Served Policy

Plaintiff contends that under the guidelines in effect when he committed his crime, he would have been entitled to an initial parole eligibility hearing on or about August 23, 2000, after having served twenty months of his five-year prison term (Pl.'s Mot. for Equitable J. at 3).[4] But for the Board's retroactive application of its 90% time-served policy to his offense, he argues, the relevant hearing examiner would have recommended a TPM date based upon service of one-third of his court-

---

F. Supp.2d at 1383. The United States Court of Appeals for the Eleventh Circuit subsequently reversed and remanded the case for further consideration in light of its intervening decision in Jones, 59 F.3d 1145. See Oglesby v. Ray, No. 1:97-CV-527-TWT (N.D. Ga. order filed on April 23, 1999 [19-1]). On remand, the district court found the policy violative of the Ex Post Facto Clause [26-1]; however, the Eleventh Circuit once again reversed the ruling in light of the intervening decision of the United States Supreme Court in Garner, 529 U.S. 244 [31-1]. Finally, on November 6, 2001, the district court ultimately dismissed the inmate's action as moot, given the Board's voluntary cessation of the application of the challenged policy [36-1]. Accordingly, the Eleventh Circuit never specifically addressed whether the district court properly treated the challenged "policy" as a "law" for ex post facto purposes.

[4] Plaintiff contends that he is entitled to credit for time served towards his August 4, 1999 sentence (217 days of pre-trial confinement) (Compl. ¶ 7).

AO 72A
(Rev.8/82)

imposed prison sentence, see O.C.G.A. § 42-9-45(f); the Board would have simply adopted said recommendation as a matter of routine practice; and plaintiff would likely have been paroled on or about the adopted TPM date, given that the Guidelines Grid rated his chance of parole as "excellent." Instead, he claims, the Board rigidly enforced its 90% time-served policy against him, retroactively extending his TPM date from August 23, 2000 to June of 2003, and increasing the length of his confinement by approximately 34 months (Pl.'s Mot. for Equitable J. at 3).

According to the evidence presented at the April 10, 2002 hearing, however, plaintiff's position is not entirely accurate. Rather, the testimony of Sullivan and Baustin established that hearing examiners are instructed to recommend the lengthiest number of months-to-serve under the guidelines. Additionally, the Guidelines Grid indicates that, "[f]or certain Crime Severity Level V, VI, and VII offenses, the Guidelines recommendation will be one-third of the court-imposed sentence length or the grid recommendation, whichever is greater" (Guidelines Grid (emphasis omitted)). Accordingly, even if the 90% time-served policy did not apply to plaintiff's offense, the Board would likely have adopted the 34 months-to-serve recommendation, it being the lengthier of the recommendations generated from the Guidelines Grid (34 months) and the one-third requirement (20 months).

22

Therefore, plaintiff could have at best expected a TPM date of October 2001 (34 months), rather than June 2003 (54 months).

Nevertheless, the approximately 20-month disparity about which plaintiff complains is not to be taken lightly. If the Board has inflexibly enforced its 90% time-served policy against plaintiff, such that its application has the force and effect of law, then the Board has created a risk of retroactively increasing his punishment. Further, if plaintiff would likely have been paroled sooner than June 2003 but for the Board's allegedly unconstitutional action, then said risk is "sufficient" to render the policy violative of the Ex Post Facto Clause. Morales, 514 U.S. at 509.

After careful review and consideration, the court answers both of these questions in the affirmative. The testimony presented to the court on April 10, 2002 established that although the Board is authorized to exercise discretion, and that the TPM recommendations are merely "recommendations" that remain "tentative" even after the Board votes to accept them, the Board does not in fact exercise any meaningful discretion in cases falling under its 90% time-served policy. Rather, the 90% time-served policy serves as an inflexible benchmark below which the Board almost never deviates. The statistical evidence, the procedures in effect, the text of the resolution itself, and the Board's internal policy statements and guidelines provide overwhelming evidence, both direct and circumstantial, of this fact.

23

### a. The Practical Implementation of the 90% Policy

The evidence presented at the April 10th hearing indicated that, from January 1, 1998 through June 30, 2001, the Board deviated below the 90% threshold in exactly 10 cases out of 8,664 (Def.'s Ex. 8). Because each of those cases involved highly unusual circumstances, however, the number of downward deviations really amounts to zero. Application of the 90% time-served policy is virtually automatic; the TPM calculation generated by the 90% time-served policy will inevitably reflect the highest number of months-to-serve submitted to the Board, a figure that the Board will always adopt. Thus, the change in the TPM formula at issue in this case is a far cry from the change examined by the Eleventh Circuit in Jones, where the court determined that the Board "retained and in fact exercised virtually unfettered discretion to deviate both above and below the Guidelines-recommendation in setting the TPM." Jones, 59 F.3d at 1149. Here, by contrast, the Board exercises unwavering adherence to the challenged 90% benchmark.

The TPM "reconsideration" process is further evidence that the Board blindly applies the 90% time-served policy. In truth, the hearing examiner who conducts this purely "paper" review exercises no discretion with respect to 90% cases. Unless an initial hearing examiner erroneously calculates the inmate's TPM date under the 90% time-served policy, when in fact the inmate's offense does not fall under that

24

policy, hearing examiners will not re-submit recommendations to the Board even if the initial recommendations contain mathematical errors. He alone makes this decision, unilaterally ending the review process without any adversarial hearing or meaningful reconsideration.

### b. The Board's Internal Policy Indicators

Likewise, the Board's December 9, 1997 resolution adopting the challenged policy, as well as the Board's related guidelines and policy statements, serve as circumstantial evidence that the 90% time-served policy is applied mandatorily. The pertinent text of the resolution provides:

> WHEREAS: Since 1991, the Board has steadily and consistently amended and refined its guidelines to provide for lengthier time-served for violent and dangerous criminals while reducing the overall number of individuals released on parole; and,
>
> WHEREAS: The Board believes that a further amendment to its statutorily mandated guidelines will further enhance public safety and make Georgia the toughest state in the nation for "time-served" for violent felonies and residential burglaries;
>
> THEREFORE: Be it now hereby resolved by the [Board] that its statutorily mandated guidelines are hereby amended to provide that any offender who is convicted on or after January 1, 1998, of one or more of [20 enumerated offenses, including aggravated assault] . . . will be required to serve a minimum of 90% of the court imposed term of incarceration in prison.

25

(90% time-served policy at 1). This language clearly expresses the Board's intent to lengthen the actual time certain inmates serve in prison, "mak[ing] Georgia the toughest state in the nation" in this regard, and declares that, with respect to covered offenders, service of a minimum of 90% of the court-imposed term of incarceration "will be required" (90% time-served policy at 1 (emphasis added)).[5]

The policy statement published on the Board's internet home page similarly declares that "[t]he Board requires all violent offenders . . . to serve a minimum of 90 percent of their court-imposed terms of incarceration." State of Georgia Board of Pardons & Paroles, "90-Percent Policy," Parole Consideration and Eligibility (www.pap.state.ga.us/eligibility.html, visited on May 2, 2002) (emphasis added). Finally, the text accompanying the Guidelines Grid indicates:

> "Board's 90% Resolution: Pursuant to Board policy, for persons CONVICTED on or after January 1, 1998, the Guidelines recommendation will be 90% of the court-imposed prison sentence or the Grid recommendation, whichever is greater . . . .

(Guidelines Grid). In each of these examples, no discretion is implied. Instead, the Board's language is unambiguously mandatory, further supporting plaintiff's

---

[5] Notably, in reviewing the parole procedures at issue in Garner, the Supreme Court declared: "Absent a demonstration to the contrary, we presume the Board follows its . . . internal policies in fulfilling its obligations." 529 U.S. at 256 (emphasis added).

26

AO 72A
(Rev.8/82)

contention that the Board's enforcement of the 90% time-served policy has the force and effect of law for ex post facto purposes.

### c. Plaintiff's Parole Success Likelihood

Given this determination, the challenged action violates the Ex Post Facto Clause if there is a substantial likelihood that plaintiff would have been paroled earlier had the Board not retroactively enforced its 90% time-served policy against him. As noted, the Guidelines Grid rates the range within which plaintiff's 14-point Parole Success Likelihood Score falls as "excellent." Yet, both Masters and Sullivan opined that plaintiff would not likely have been paroled even if the 90% time-served policy did not apply to his offense. Masters and Sullivan explained that, in their opinion, the Superior Court sentenced plaintiff to an unusually light term of confinement, anticipating that the Board would require plaintiff to serve at least 90% of it. Thus, they argued, the Board would not likely have recommended an October 2001 TPM even without the 90% requirement.

The statistical evidence presented at the April 10th hearing nonetheless established that although plaintiff received a shorter than average prison term, his term (5 years) was shorter than average as compared to all non-life aggravated assault sentences imposed during 1998 (6.3 years), a year in which Superior Court judges would have been aware of the new 90% requirement (Def.'s Ex. 12). It is

27

fair to infer, therefore, that the sentencing court imposed a shorter than average term not because of its awareness of the 90% requirement, but because it did not regard plaintiff's crime as particularly egregious as compared to other aggravated assaults. Further, the court notes that plaintiff's June 2003 TPM would require him to serve 54 months, or 4.5 years, a prison term that greatly exceeds the average time-served attributable to all aggravated assault offenders released from 1996 through 2001 (Pl.'s Ex. 6 at 3; Def.'s Ex. 12). The court cannot reconcile this fact with plaintiff's 34-month grid score and his parole success rating of "excellent" without concluding that plaintiff would likely have received an earlier TPM date but for the Board's retroactive application of the 90% time-served policy. Accordingly, plaintiff has made the requisite showing of unconstitutionality under the Ex Post Facto Clause.

## IV. Prerequisites for Injunctive Relief

To prevail on a motion for injunctive relief, a plaintiff must establish the following four factors: (1) actual success on the merits; (2) a threat of irreparable injury; (3) that plaintiff's own injury would outweigh the injury to defendant; and (4) that an injunction would not disserve the public interest. See Tefel v. Reno, 180 F.3d 1286, 1295 (11th Cir. 1999); Spottsville v. Barnes, 135 F. Supp.2d 1316, 1318 (N.D. Ga. 2001) (citing Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987)). See also Siegel v. LePore, 234 F.3d 1163, 1213 (11th Cir. 2000)

28

(Carnes, J., dissenting). With respect to plaintiff's ex post facto claim, the court concludes that plaintiff's showing justifies the injunctive relief he seeks. Accordingly, plaintiff's motion for equitable judgment is hereby **GRANTED** [7-1].

## IV. Conclusion

Having determined that the Board's retroactive enforcement of its 90% time-served policy against plaintiff is unconstitutional and invalid for the reasons set forth herein, plaintiff's motion for equitable judgment is hereby **GRANTED** [7-1]. Defendant State Board of Pardons & Paroles, its officers, agents, servants, employees, attorneys, and all persons acting in concert or participation with the State Board of Pardons & Paroles who receive actual notice of this order by personal service or otherwise, are hereby **RESTRAINED** and **ENJOINED** from taking any actions of any kind, legal or otherwise, to carry out, assert and/or enforce the 90% time-served policy as it relates to this individual - plaintiff Coleman Jackson. Defendant is hereby **ORDERED** to provide plaintiff with an initial parole eligibility hearing within **FORTY-FIVE (45) DAYS** of the issuance of this order. Further, defendant is hereby **ORDERED** to consider plaintiff's parole eligibility without regard to the 90% time-served policy. To the extent that plaintiff's counsel has moved for an order directing plaintiff's immediate release from custody, said

29

motion is hereby **DENIED**.   Nevertheless, the court will reconsider plaintiff's request if defendant fails to comply with this order.

IT IS SO ORDERED, this 29th day of May, 2002.

William C. O'Kelley
Senior United States District Judge

AO 72A
(Rev.8/82)